IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


AK-CHIN INDIAN COMMUNITY              )         No. 06-2245 (JR)
v. DIRK KEMPTHORNE, *et al*.,         )
                                      )
PASSAMAQUODDY TRIBE OF MAINE          )         No. 06-2240 (JR)
v. DIRK KEMPTHORNE, *et al.*,         )
                                      )
SALT RIVER PIMA-MARICOPA              )         No. 06-2241 (JR)
INDIAN COMMUNITY v.                   )
DIRK KEMPTHORNE, *et al.,*            )
                                      )
TOHONO O'ODHAM NATION                 )         No. 06-2236 (JR)
v. DIRK KEMPTHORNE, *et al.*,         )
_____ )  **(Electronically filed on July 16, 2008)**


**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
<u>ENTRY OF TRUST RECORD PRESERVATION ORDER</u>**

## I.    INTRODUCTION

In their June 20 response, Trustee-Delegates acknowledge that the preservation of tribal trust records is "essential" to the fulfillment of their fiduciary obligations.[1]  Among Trustee-Delegates' declared fiduciary obligations is the duty to "maintain[] those documents that are necessary for an accounting."  *Cobell v. Norton,* 240 F.3d 1081, 1106 (D.C. Cir. 2001) ("*Cobell VI*").  The destruction or loss of trust records potentially relevant to a complete accounting is not only "clear evidence" of a breach of this trust duty,[2] but it also seriously jeopardizes Trustee-Delegates' ability ever to provide the adequate accounting sought by plaintiffs and required by law.[3]

Even so, there is overwhelming evidence of record before this Court that irreplaceable trust data has been damaged or lost time and time again.  As this Court recently recognized, "Interior has an abysmal record of failing to prioritize the maintenance and preservation of trust documents.  Many court opinions, audits and congressional committee reports have catalogued that record."  *Cobell XX,* 532 F. Supp.2d at 46.  Yet, the government tries to downplay the significance of the numerous examples of record destruction and loss catalogued by plaintiffs in support of their request for entry of a Preservation Order, dismissing such incidents as "too outdated to have any significance to this litigation" (Resp. at 24) or as attributable to "roof leaks, extreme weather . . . or other unforeseeable events" (Resp. at 29).

---

[1] *See* Def. Exh. 1 – Griles 3/20/02 Memo to "All [Interior] Employees" at 2:  "You must preserve Tribal Trust Documents involving all Tribes.  Preserving Tribal Trust Documents is essential to enable Interior to fulfill its obligations."

[2] *Cobell VI,* 240 F.3d at 1106.

[3] *See Cobell v. Kempthorne*, 532 F. Supp.2d 37, 46 (D.D.C. 2008) ("*Cobell XX*") (concluding after nearly 12 years of protracted litigation involving individual Indian trust beneficiaries' claims for an equitable accounting, that "[a]fter decades of neglect, it is impossible to imagine that all documents necessary to perform a complete historical accounting are presently accessible to Interior").

What is far more telling, however, is what Trustee-Delegates do not and cannot deny – that the government's systems for preserving Indian trust data have been broken for decades. Moreover, the claimed improvements in Trustee-Delegates' retention policies have not prevented the loss of tribal trust documents from continuing to the present day.

Indeed, the nearly 900 pages of declarations, memoranda and reports filed along with Trustee-Delegates' June 20 Response – ostensibly to support their position that there is no need for a preservation order – instead reveal a veritable multitude of problems. Many tribal trust documents are, by defendants' own admission, "records in jeopardy" at the local BIA offices where they are stored;[4] such documents are at risk due to Trustee-Delegates' failure to take even the most basic steps to protect them;[5] and Trustee-Delegates' retention practices are beset with

---

[4] *See* Def. Exh. 26 – Harjo Decl., Tab A at 3 (2005 Indian Trust Examination Report findings that "*[t]he Agency had 12 boxes of records in jeopardy. The twelve boxes were stored on the floor, and thus susceptible to the risk of insect infestation, fire or other potentially damaging situations*") (emphasis added); Def. Exh. 27 – Cleve Her Many Horses Decl. at ¶ 3 (referring to an Office of Trust and Review Audit ("OTRA") finding of a "*records in jeopardy situation*" that existed in the Agency basement") (emphasis added); Def. Exh. 28 – Houle Decl., Tab A at 5 (2004 Site Assessment Report finding that "*trust records were found to be in jeopardy due to the lack of fire proof filing equipment, an internal sprinkler system, and a concern that flooding may occur where a majority of Land Operations and Realty trust program records are stored*") (emphasis added); Def. Exh. 43 – McDade Decl., Tab A at 4 (December 31, 2007 Memo Attachment (concerning need to "*store the 35.5 cubic feet of inactive trust records . . . in fireproof filing cabinets or transfer the records . . . to the AIRR as soon as possible. These records are in jeopardy*") (emphasis added); Def. Exh. 47 – Dutschke Decl., Tab A at 6 (Assessment Report finding that "*[a]ll program trust records are currently stored in non-fireproof filing cabinets and considered 'records in jeopardy' as they are original documents. These trust records could be destroyed or damaged if a fire occurred and would be irreplaceable*") (emphasis added); Def. Exh. 53 – Rosen Decl., Tab A at 5 (Assessment Report finding that "*original (historical) trust documents dating back to the early 1900's . . . are in jeopardy*") (emphasis added).

[5] *See* Def. Exh. 19 – Duffy Decl. at ¶ 5 (tribal trust records stored in a building experiencing "occasional leaks"); Def. Exh. 37 – Langan Decl. at ¶ 3 ("some" tribal records not stored in fire-proof cabinets due to wooden floors "not conducive to support additional fire proof files . . . ."); Def. Exh. 38 – Harwood Decl. at ¶ 4 ("[F]ire-resistant cabinets are too heavy for the Region's current location"); Def. Exh. 40 – Martinez Decl. at ¶ 8 ("Inadvertent destruction of records occurred as the result of a fire on November 21, 1980"); Def. Exh. 41 – Maytubby Decl., Tab A

"significant deficiencies . . . likely to result in deterioration or harm to Indian trust assets if not addressed . . . ."[6] Moreover, the policy which Trustee-Delegates announced four years ago as a partial solution to such problems – classifying older tribal trust records as "inactive" and then moving them to the American Indian Records Repository ("AIRR") in Lenexa, KS – has been frustrated by the failure of local BIA offices to comply with various Interior directives.[7] As a result, critical trust records are vulnerable to damage or loss notwithstanding Trustee-Delegates' claimed commitment to better protect such materials.

Under these circumstances, the Preservation Order proposed for entry by Plaintiff-Tribes should be welcomed by Trustee-Delegates as an additional tool to assist these fiduciaries in meeting the daunting challenge of rectifying the "abysmal" situation that has plagued the

---

at 2 ("Records that have been boxed and placed in the floors should be examined for possible infestation, decontamination, inventoried and transferred to the AIRR"); Def. Exh. 45 – Morigeau Decl. at ¶ 7 ("Inadvertent destruction as the result of fire occurred in 1968"); Def. Exh. 47 – Dutschke Decl. at ¶ 4 ("Fire safe file cabinets can't be used in most areas in our second floor office because of weight restrictions"); Def. Exh. 55 – Siquieros Decl. at ¶ 2 (noting "small leaks . . . from the roof in the warehouse where 361.5 cubic feet of trust records are stored); Def. Exh. 56 – Speaks Decl. at ¶ 11 ("Inadvertent flooding . . . effected [sic] lease documents covering the period of 1980 to 1986").

[6] *See, e.g.*, Def. Exh. 40 – Martinez Decl., Tab B at 1 (April 11, 2008 Memo acknowledging that: "*The initial assessment report documented 35 records management deficiencies at the Pima Agency*" . . . . *Seven corrective actions remain outstanding*.") (emphasis added); Def. Exh. 44 – Montes Decl. at ¶ 5 (referring to August 30, 2007 assessment report finding that "*inactive records had not been transferred to the American Indian Records Repository ("AIRR")*" (emphasis added); Def. Exh. 48 – Orozco Decl., Tab A at 2 (Trust Examination Report "Executive Summary" explaining that:  "*Significant deficiencies are practices that deviate from sound fiduciary principles and are likely to result in deterioration or harm to Indian trust records if not addressed and/or result in substantive noncompliance with laws, regulations or court decisions*") (emphasis added).

[7] *See* Def. Exh. 8 – 2005 Cason Memo expressing concern that "*there appears to be a considerable number of cubic feet (i.e. boxes) of inactive records at field locations and the number is continuing to grow, creating a backlog to grow, creating a backlog situation*") (emphasis added); Def. Exh. 9 – 2006 Memo from Office of Trust Records Director advising that "*[w]e are finding that BIA offices are not preparing records prior to the arrival of OTR's Contractor and this is causing delays to the project*") (emphasis added); Def. Exh. 10 – 2007 Memo from CIO, Office of the Special Trustee re "Records Backlog Project" raising the same concern a year later.

3

government's administration of Indian trusts for so many years. Yet, with so much to be gained by having a Preservation Order in place in this litigation, Trustee-Delegates instead have filed a 45-page response in which they throw everything but the kitchen sink into their effort to resist its entry. Rather than acknowledge the clear and compelling need for the proposed Order, Trustee-Delegates argue (1) that the Court's consideration of such an Order at this stage is "premature;" (2) that any such relief cannot properly issue without Plaintiff-Tribes satisfying the more rigorous requirements for entry of a preliminary injunction; and (3) that the proposed Preservation Order is unnecessary and unduly burdensome.

As the following examination of Trustee-Delegates' arguments reveals, however, such contentions are lacking in merit. In fact, the proposed Preservation Order is clearly necessary and carefully tailored to enhance the protection of vital tribal trust records without dictating the steps Trustee-Delegates must take to accomplish this critically important objective. Contrary to what Trustee-Delegates argue, the entry of such an Order at this stage of the litigation is hardly "premature" – not when irreplaceable trust records continue to be at risk of loss and the consequences of their destruction or loss are potentially so severe. In addition, the Court's authority to issue such relief pursuant to Rule 16(c) – without Plaintiff-Tribes having to meet the more stringent requirements for a preliminary injunction as Trustee-Delegates assert – is well-established in tribal trust litigation. *See Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 137-138 (2004). Accordingly, the Preservation Order proposed by Plaintiff-Tribes should be entered forthwith.

4

## II.    ARGUMENT

### A.    Trustee-Delegates' Argument that a Preservation Order  Would Be "Premature" is Completely Unfounded.

All of the two dozen cases in which tribal plaintiffs are seeking the entry of the Preservation Order are at least 18 months-old (the equitable accounting action brought by the Chippewa Cree Tribe of the Rocky Boy's Reservation was filed in 2002)  Yet Trustee-Delegates' "threshold" argument in opposition to the Preservation Order is that any consideration of such relief at this stage would be "premature."  (Resp. at 7).

The erroneous assumption underlying this argument is that Plaintiff-Tribes' equitable accounting claims are nothing more than "generic" APA review cases, and hence that the only discovery to which Plaintiff-Tribes are entitled is "discovery of the administrative record related to the agency action Plaintiff is challenging."  (Resp. at 7).  Trustee-Delegates completely ignore the fact that even if this were true, the tribal trust records necessary to accomplish the accounting of Plaintiff-Tribes' funds and other trust assets would need to be maintained and thus protected against the risk of destruction or loss.  Instead, Trustee- Delegates assert that because Plaintiff-Tribes' entitlement to discovery has not yet been established, there is no current need for the Court to consider the entry of a Preservation Order.  Trustee-Delegates even allege that the entry of such an order at this stage would exceed the Court's jurisdiction (Resp. at 8).

Such an argument fails because it is based on a fundamental misperception of what these cases are about.  Plaintiff-Tribes' accounting claims do not rely on the APA for their sole cause of action.  Rather, Plaintiff-Tribes' claims also are rooted in the various treaties and statutes which give rise to the trust relationship between the United States and these beneficiaries, and which invoke this Court's inherent equitable authority to enforce the terms of such trusts.  (*See, e.g.*, Salt River Complaint ¶¶ 9, 16).

5

The APA provides the necessary waiver of sovereign immunity, but Plaintiffs-Tribes' cause of action arising in equity is distinct from and in no way dependent upon the APA. This is because the accounting obligation and other duties that Plaintiff-Tribes seek to enforce in this litigation are fiduciary duties that can be enforced *outside* of the APA.[8]

Accordingly, discovery in these cases is not limited by the APA as Trustee-Delegates erroneously contend. Indeed, "[t]he narrower judicial powers appropriate under the APA do not apply . . . because the underlying lawsuit is both an Indian case and a trust case in which trustees have egregiously breached their fiduciary duties." *Cobell v. Norton*, 391 F.3d 246, 257-58 (D.C. Cir. 2004) ("*Cobell XII*").

Remarkably, Trustee-Delegates claim the *Cobell* case supports their "APA/no discovery" contention (*See* Resp. at 8-9). Yet in the course of this other Indian trust litigation, the Court has permitted extensive discovery in support of individual Indian beneficiaries' equitable accounting claims. And the trust record preservation order issued by this Court in *Cobell* in August 1999 is the model for similar relief being sought by these tribal plaintiffs nine years later.[9]

Indeed, Trustee-Delegates' "APA/no discovery" contention was squarely addressed and rejected by this Court in the *Cobell* trust litigation three and one-half years ago. In *Cobell v. Norton*, 226 F.R.D. 64 (D.D.C. 2005), Trustee-Delegates moved to quash deposition notices served on Interior officials to examine the government's later-discredited contention that long-standing problems with IT security had been resolved. In support of their motion, Trustee-Delegates argued that the individual trust beneficiaries' claims for an equitable accounting

---

[8] As addressed in greater detail in Plaintiffs' Principal Brief in Opposition to Defendants' Motion to Dismiss, Plaintiff-Tribes also allege claims under § 706 of the APA as *alternative* causes of action. However, these claims are wholly distinct from Plaintiff-Tribes' independent cause of action to enforce statutory trust terms and duties against their trustee.

[9] *See Cobell v. Babbitt*, No. 1:96 CV01285 (August 12, 1999) ("Order Regarding Interior Department IIM Records Retention") [Dkt No. 370].

"involv[ed] no more than judicial review of a prototypical administrative action under the APA" and that "judicial review is limited to the administrative record." *Id*. at 92. They further contended that *prior to any discovery* "the compilation and Court review of the administrative record must be completed." *Id*.

This Court denied the motion to quash and flatly rejected Trustee-Delegates' attempted characterization of the individual beneficiaries' accounting claims as "ill-founded" and "unsound." *Id*. at 92. The Court also observed that despite their repeated attempts to do so, "Trustee-Delegates have never been successful in portraying this litigation as a typical case of judicial review of agency action." *Id*. *See also Cobell v. Norton*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("*Cobell XVIII*") (holding that "because the underlying lawsuit is both an Indian case and a trust case in which the trustees have egregiously breached their fiduciary duties, the court retains substantial latitude, much more so than in the typical agency case, to fashion an equitable remedy") (quotations and citations omitted).

So here, Trustee-Delegates' attempt to portray this litigation as something it is not – in this instance to prevent the Court's timely consideration of a Preservation Order clearly needed to halt the further loss of irreplaceable tribal trust records – should be dismissed out-of-hand. This Court clearly has inherent equitable authority to ensure the beneficiaries' protection. *See, e.g., Village of Brookfield v. Pentis*, 101 F.2d 516, 520-21 (7th Cir. 1939) ("Courts of equity have original inherent jurisdiction to decree and enforce trusts and do whatever is necessary to preserve them from destruction"). And, where tribal trust records critical to the performance of Trustee-Delegates' accounting duty are at risk of destruction or loss, the Court clearly has the authority to take timely action to enforce Trustee-Delegates' fiduciary obligation to preserve and protect such materials. *See Cobell VI*, 240 F.3d at 1106 (affirming the district court's finding

that "[t]he Treasury Department's failure to maintain such documents is a breach of its fiduciary duty").

Trustee-Delegates' attempted reliance on *Cobell v. Norton*, 392 F.3d 461 (D.C. Cir. 2004 ("*Cobell XIII*") as an obstacle to entry of the Preservation Order is entirely misplaced.  To be sure, in *Cobell XIII* the D.C. Circuit vacated provisions of a 2003 structural injunction compelling Trustee-Delegates' compliance with sixteen additional trust duties declared by the district court, holding that the court lacked the authority to "issue enforcement remedies – by any means – for trust breaches that it has not found to have occurred." *Id*. at 474.  *None* of those trust duties, however, pertained to the obligation to maintain trust records vital to the performance of Trustee-Delegates' duty to account, which had been previously declared and affirmed in *Cobell VI*.  Moreover, *Cobell XIII* reaffirmed the Court's authority to "consider[] specific claims that Interior breached particular statutory trust duties, understood in light of the common law of trusts, and to ordering specific relief for those breaches." *Id*. at 477.  And it further declared that "[t]o the extent Interior's malfeasance is demonstrated to be prolonged and ongoing, more intrusive relief may be appropriate, as we held was the case in *Cobell VI* for the government's failure to provide a statutorily required accounting." *Id*. at 478.

Accordingly, rather than impede the Court's ability to enter the Preservation Order sought by Tribal-Plaintiffs, *Cobell XIII* actually provides further support for its entry.  Here there is compelling evidence of Trustee-Delegates' breach of their duty to maintain trust-related documents by allowing such data to be lost or destroyed.  The proposed Preservation Order is precisely the "specific relief" authorized by the D.C. Circuit in *Cobell XIII* to address such a problem.

In short, this Court's hands are not tied as Trustee-Delegates suggest. The proposed Preservation Order is clearly necessary to preserve and protect trust records vital to the fulfillment of Trustee-Delegates' fiduciary duties – just as such relief was required in the *Cobell* case nine years ago. There is absolutely no reason to delay the Order's entry.

> **B.      Trustee-Delegates' Argument that the Preservation Order Is a Request For a Preliminary Injunction is Similarly Unavailing.**

Trustee-Delegates further argue that the Preservation Order may issue only if Plaintiff-Tribes satisfy the requirements for entry of a preliminary injunction. (Resp. at 10). This argument is similar to what the government contended 4-1/2 years ago in unsuccessfully opposing the preservation order for tribal trust records entered in *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133 (2004). There the United States claimed that the Court of Claims was unable to issue the preservation order sought by the plaintiff tribe because it lacked the jurisdiction as an Article I court to grant such injunctive relief.

The Court of Claims rejected that argument, "relying particularly on RCFC 16" in holding that it had "the power to preserve evidence and issue orders in furtherance thereof." *Id*. at 137. As the source of its case management authority, the *Pueblo of Laguna* court pointed to Rule 16(c), which provides that the court "may take appropriate action" with respect to "the control and scheduling of discovery," "the need for adopting special procedures for managing potentially difficult or protracted actions" and any such "matters as may facilitate the just, speedy and inexpensive disposition of the action." *Id*. at 137. The court thus concluded that Rule 16(c) authorized the issuance of a preservation order provided that the party requesting such relief "demonstrate[s] that it is necessary and not unduly burdensome." *Id*. at 138.

In so holding, the *Pueblo of Laguna* court squarely addressed the argument that Trustee-Delegates once again are raising here – *i.e.*, that the more demanding requirements for issuing a

9

preliminary injunction would have to be satisfied before such a preservation order could issue. *Id*. at 138 n.8. The court found the government's argument unpersuasive, observing that "a document preservation order is no more an injunction than an order requiring a party to identify witnesses or produce documents in discovery." *Id.* It specifically rejected the need to "observe the rigors of the four-factor analysis ordinarily employed in issuing injunctions" – calling it "an approach [that] would be decidedly to put the cart before the horse." *Id.*

The majority of courts that have addressed this issue have concluded – like the court in *Pueblo of Laguna* – that there is *no* need for a party seeking to preserve documents to satisfy the more stringent requirements for injunctive relief. *See, e.g., Treppel v. Biovail Corp.*, 233 F.R.D. 363, 370 (S.D.N.Y. 2006); *Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. 429, 431 (W.D. Pa. 2004); *and* the other case authorities cited in Plaintiffs' April 29 Memorandum of Points and Authorities (at 7). Yet, Trustee-Delegates cite a single published district court decision from more than 40 years ago and two other more recent unpublished decisions as support for their contrary position (Resp. at 10). Notably, these same case authorities were presented to and rejected as unpersuasive by the court in *Pueblo of Laguna. See id*. at 138 n.8.

Defendants' cited cases are readily distinguishable. In *Madden v. Wyeth*, 2003 WL 21443404 (N.D. Texas April 16, 2003), for example, the court declined to issue a document preservation order in a product liability suit "without some proof that evidence may be lost or destroyed without a preservation order." *Id*. at *1. Unlike the situation here, there was no record of systematic destruction and loss of vital records dating back decades and continuing to the present day. *See also Pepsi-Cola Bottling Company of Olean v. Cargill, Inc.*, 1995 WL 283610

10

at *4 (D. Minn. Oct. 20, 1995) (concluding that "a Preservation Order is warranted only upon a showing that one is needed" and that "[n]o showing of need has been made here").

So too, in *Humble Oil & Refining Co. v. Harang*, 262 F. Supp. 39 (E.D. La. 1966), the defendant charged with attempting to "conceal, destroy or otherwise plac[ing] documents beyond reach" testified under oath "that he had all of the disputed documents and that he had no intention of destroying them;" and his attorney responded to plaintiff's allegations by offering to exchange documents through discovery. *Id*. at 43. The court in *Humble Oil* thus held that plaintiff had failed to demonstrate the threat of document destruction was real, "in view of defendant's testimony and his attorneys' offer." *Id*.

Such situations are a far cry from the evidence of record in this litigation, in which unrefuted instances of record destruction and loss date back decades and continue to the present day. Indeed, the compelling need for entry of the Preservation Order sought by Plaintiff-Tribes would appear to fully satisfy the requirements for "injunctive" relief set forth in all three of Trustee-Delegates' cited cases. *See Humble Oil, supra*, 262 F. Supp. at 43 (recognizing the court's authority to issue a preservation order where "the rights of the parties seeking the relief are not otherwise adequately protected by ordinary legal processes"); *Madden, supra*, at *4 (preservation order to be entered "only upon an adequate showing that equitable relief is warranted"); *Pepsi-Cola Bottling, supra* at *4 (requiring a showing – as in *Pueblo of Laguna* – "that one is needed").

Contrary to what Trustee-Delegates further assert (Resp. at 10-11), entry of the proposed Preservation Order will *not* create a potential conflict with D.C. Circuit precedent regarding when a party may be sanctioned for its failure to preserve evidence. In moving for the issuance of such an Order, plaintiffs are not asking that Trustee-Delegates should be sanctioned for their

US2000 10931078.1

past destruction of evidence.  Rather, Plaintiff-Tribes are merely asking that the Court take steps to ensure that tribal trust documents are preserved in this litigation in view of the pattern of destruction found in *Cobell* and in the government's own reports dating back for decades.  The proposed Order is intended to *minimize* the potential for the further destruction and loss of such records and thereby *reduce* the risk that sanctionable conduct will occur in the future.

Nothing in the proposed Preservation Order addresses the question as to when sanctions for violations of the Order's terms would be appropriate.  That is to be left to the Court's rules and relevant D.C. Circuit precedent if the situation arises.  Instead, the Preservation Order merely puts those receiving it on notice that "[f]ailure to comply with this Order may lead to the imposition of sanctions."  (*See* ¶ 7).  As the *Pueblo of Laguna* court recognized in issuing a preservation order containing the identical provision, "[s]uch an order . . . serves as fair warning that sanctions *may* be imposed should defendant instead fail adequately to protect records relevant to this action."  60 Fed. Cl. at 139 (emphasis added).  In short, entry of the Order would not present the "potential conflict" with D.C. Circuit precedent that Trustee-Delegates struggle in vain to suggest.

### C.    The Proposed Preservation Order Satisfies the Requirements of *Pueblo of Laguna*

Trustee-Delegates acknowledge (Resp. at 12), as they must, that under the two-pronged test for entry of a preservation order adopted in *Pueblo of Laguna*, plaintiffs are entitled to such relief so long as the proposed Order is (1) necessary and (2) not unduly burdensome.  *Pueblo of Laguna*, 60 Fed. Cl. at 138.  The Preservation Order proposed for entry in the tribal accounting litigation clearly satisfies both of these requirements.

12

### 1.    The Proposed Order is Clearly Necessary.

"To meet the first prong of this test, the proponent ordinarily must show that absent a court order, there is a significant risk that relevant evidence will be lost or destroyed[.]"  *Pueblo of Laguna*, 60 Fed. Cl. at 138.  This burden is "often met by demonstrating that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place."  *Id*.  Such a burden is clearly met in this instance in view of the following:

- *There is overwhelming evidence that Trustee-Delegates have "lost or destroyed" trust records essential to the fulfillment of their trust duties* – Moreover, the destruction and loss of such vital records continues to the present day.  (*See* Plaintiff's April 29 Memorandum of Points and Authorities at 14-27).

- *Trustee Delegates' retention procedures have been and remain "inadequate"* – Despite Trustee-Delegates' claims of improvement, their June 20 submissions to the Court reveal that many tribal trust records are still "records in jeopardy" and that "significant deficiencies" in Defendants' practices have been identified and remain unresolved.  (*See* Plaintiffs' Reply at pages 2-3 and footnotes 4-6 thereto, *supra*.)

Rather than acknowledge these serious concerns, Trustee-Delegates assert that many of the examples of the destruction and loss of trust records catalogued in Plaintiff-Tribes' Motion are "irrelevant," and they further contend that the government has "cleaned up its act" since such incidents occurred.  These contentions are addressed in sections (a)-(d) below.

### a.    Trustee-Delegates' No "Relevance" Argument.

Trustee-Delegates assert that the many examples of destruction and loss cited by plaintiffs are not relevant here because Plaintiff-Tribes have not established that their own records have been victims of such destruction or loss.  (Resp. at 13).

US2000 10931078.1

Contrary to what Trustee-Delegates argue, however, Plaintiff-Tribes are *not* required to show that their own trust records have been lost/destroyed to qualify for the Court's protection. In *Pueblo of Laguna*, the Court of Claims recognized that the tribe seeking the entry of the preservation order there was requesting protection for "*different* records" than had been involved in the *Cobell* trust litigation. 60 Fed. Cl. at 139. Yet the court found the failures evidenced in *Cobell* to be "so pervasive and systematic as to provide ample support for the issuance of a document preservation order in this case." *Id*. at 139. *See also* the July 9, 2008 Order entered in *Seminole Nation of Oklahoma v. United States*, No. 06-935L (CFC finds protection of the plaintiff tribe's trust records to be necessary "*in light of the prior loss or destruction of documents in related cases*") (emphasis added) (copy attached as Reply Exh. 1).

Trustee-Delegates' reliance on *Treppel v. Biovail Corp.*, 233 F.R.D. 363 (S.D.N.Y. 2006) as suggesting the need for a more exacting showing of harm is misplaced. The court in *Treppel* declined to enter the preservation order sought by the plaintiff in that litigation because "plaintiff has not yet made the most basic showing that any documents potentially relevant to this litigation were lost." *Id*. at 372. However, the court explicitly rejected the idea that plaintiff had to make a particularized showing "that specific documents were lost" in order to obtain such relief. The *Treppel* court recognized that it would be "difficult to evaluate the injury that might be caused by the destruction of evidence without yet knowing the content of that evidence." *Id*. at 370.

So here, Plaintiff-Tribes are fully justified in relying upon prior incidents involving other Indian trust records than their own in support of their request for relief. Plaintiff-Tribes do not have to wait until they are able to pinpoint with precision that their own materials have been irretrievably damaged or lost to obtain the Court's protection. This is particularly true where, as here, the numerous incidents of destruction and loss recited by Plaintiff-Tribes demonstrate a

US2000 10931078.1

clear pattern of failure to protect similar types of Indian trust records held by these same Trustee-Delegates.  Indeed, the very purpose of the proposed Preservation Order in this litigation is to protect Plaintiff-Tribes' trust records from the identical fate.

### b.    Allegedly "Outdated" Examples of Destruction/Loss.

Trustee-Delegates further assert that many of the examples the Plaintiff-Tribes have provided of document destruction and loss are not relevant to this litigation because they occurred before the construction of the AIRR four years ago and the implementation of Trustee-Delegates' policy for moving "inactive" trust records there for safekeeping (Resp. at 25-28).  Yet, a number of the examples cited by Plaintiff-Tribes in their April 29 Motion (including the destruction of 15 boxes by the Treasury subcontractor and the 9 boxes of trust records damaged by water and mold currently under investigation by Judge Allegra in the CFC) are very recent examples of destruction.    These incidents, and others cited at pp. 20-27 of Plaintiffs' Memorandum of Points and Authorities, all *post-date* the completion of the AIRR.

Such post-2004 examples are, by themselves, sufficient to warrant entry of the proposed Preservation Order.    Considered in light of Trustee-Delegates' "pervasive and systematic" failures, the more recent examples of destruction and loss are clearly not isolated events or the result of mere happenstance.  Instead, they demonstrate that the breach of Trustee-Delegates' duty to preserve trust records remains unrectified.  Taken together with the confessions of "records in jeopardy" and "significant deficiencies" contained in Defendants' June 20 submissions to this Court, the recent examples of destruction and loss cited by Plaintiff-Tribes serve to illustrate all too well that Trustee-Delegates' "pervasive and systematic" failures still have not been resolved.

US2000 10931078.1

c.    **Trustee-Delegates' "Unavoidable Destruction" Argument.**

Perhaps the most remarkable of Trustee-Delegates' contentions is their argument that the Preservation Order is unnecessary because much of the evidence of past destruction and loss focuses on severe weather events or damage due to mold and rodents, and "such events often occur in spite of the best efforts of the persons maintaining the records" (Resp. at 28-31). Defendants clearly know better than to contend that such events are "unavoidable" – indeed, they claim to be committed to a policy of moving "inactive" trust records to the AIRR to protect against precisely such environmental risks.  *See* Def. Exh. 8 –Cason Memo ("It is important that we adequately protect our records and moving them to the state-of-the-art records archives in Kansas is the best way to do that").

As Trustee-Delegates recognize, the destruction of documents by water, fire, mold, rodents, etc. can be avoided by keeping such records up off the floor,[10] by storing them in fireproof cabinets,[11] by placing them in locations free of water leaks, etc.[12]  Indeed, the Court and numerous reports have taken Trustee-Delegates to task for allowing the destruction of trust records in their custody and control.  Yet, notwithstanding the recognition nearly 20 years ago of serious environmental risks that needed to be corrected, these same problems have been permitted to persist.

When such incidents of damage or loss occur, they need to be brought to light immediately so that the Court can take steps (as CFC Judge Allegra has done in response to the

---

[10] *See, e.g.,* Def. Exh. 26 – Harjo Decl., Tab A at 3 (finding boxes of trust records "stacked on the floor, and thus susceptible to the risk of insect infestation, fire or other potentially damaging situations").

[11] *See, e.g.,* Def. Exh. 47 – Dutschke Decl., Tab A at 4 (finding "irreplaceable" trust records "currently stored in non-fireproof filing cabinets and considered records in jeopardy").

[12] *See, e.g.,* Def. Exh. 28 – Houle Decl., Tab A at 5 (finding a "records in jeopardy situation" for trust records due in part to "a concern that flooding may occur").

16

government's April 15, 2008 notice of nine boxes of mold/water damaged trust records) to make sure additional documents are not destroyed (or further damaged) by the elements.[13] Obviously, if vital tribal trust records are not protected against destruction or loss prior to their being classified as "inactive" and shipped to the AIRR, Trustee-Delegates' entire preservation effort risks being undermined.[14]

### d.   The Government's Claimed Effort to Clean Up Its Act.

Trustee-Delegates devote nearly a dozen pages of their June 20 Response to a description of the efforts they have made to correct the deficiencies in their system for managing Indian trust documents. (*See* Resp. at pp. 14-24). Despite these representations, and despite additional policies to preserve records referenced in Trustee-Delegates' June 20 submissions to the Court, the incidents of document destruction and loss persist. Alas, trust records continue to be "in jeopardy" at numerous Interior locations – vulnerable to further destruction and loss due to "significant deficiencies" in Trustee-Delegates' handling and storage practices. *See* footnotes 4-6, *supra*.

Even so, Trustee-Delegates assert that the proposed Preservation Order is unnecessary because it would add nothing to the regime already in place (Resp. at 20-24). This is plainly

---

[13] Defendant's court-mandated investigation of the water/mold issue in *Navajo Nation v. United States*, No. 06-945L has resulted in its disclosure of seven additional boxes of trust records apparently exposed to water or mold and now undergoing further testing and possible remediation. *See* "Defendant's Supplemental Notification of Additional Discovery of the Possible Presence of Mold or Water Damage to Documents" dated July 8, 2008 (copy attached as Reply Exh. 2).

[14] As this Court has recently recognized, while "the [Lenexa facility] reflects a significant improvement in the conditions and treatment of the records that have survived the cramped, disorganized, flooded, rat-infested storage facilities in which some of them were found, it is unclear from the evidence presented at trial what percentage of total IIM records that should have been maintained over the life of the trust have actually been recovered and shipped to the AIRR." *Cobell XX*, 532 F. Supp.2d at 46. The serious problems revealed in Defendants' June 20 submissions suggest there is cause for a similar concern with respect to *tribal* trust records.

17

incorrect. For example, the retention efforts the government describes in its Response – including the issuance of inter-agency instructions and "reminder" notices, training, etc. – for the most part do *not* extend to contractors (despite the 2007 loss of 15 boxes of trust records blamed on an employee at a storage facility retained by the contractor holding such materials for Treasury). The proposed Preservation Order, by contrast, would require that contractors be advised of the terms of the Preservation Order and sign an acknowledgment of their receipt of the Order.

In addition, without such an Order, there is nothing that imposes an affirmative duty upon Trustee-Delegates to notify the Court of the destruction or loss of trust records. This is a particularly important requirement, because it gives the Court an opportunity to investigate the cause of any reported violation and to monitor any resulting corrective action when/if an incident of loss or destruction occurs. As the record in *Cobell* and the CFC tribal trust cases reflects all too well, the government has a track record of waiting months before bringing such incidents to the Court's attention. Plaintiff-Tribes and this Court should not be "kept in the dark" regarding incidents which threaten irreparable harm to the trust beneficiaries and jeopardize the very integrity of the judicial process.

### 2.    The Proposed Preservation Order Is Not Unduly Burdensome.

To satisfy the second prong of the *Pueblo of Laguna* test, "the proponent must show that the particular steps to be adopted will be effective, but not overbroad." *Pueblo of Laguna*, 60 Fed. Cl. at 138. The proposed Preservation Order clearly satisfies this additional requirement in view of the following:

- Similar to the orders entered in other tribal trust cases, the Preservation Order directs Trustee-Delegates to take "reasonable steps to preserve all documents, data or tangible

18

things," and to report immediately any destruction or loss of records (*see* ¶¶ 1(a) and 2(c)). The Order does *not* purport to dictate the specific steps Trustee-Delegates must take to achieve compliance with its terms (*see* ¶ 2). Rather, here, as in *Pueblo of Laguna*, the Order's provisions "rel[y] upon the expectation that defendant . . . is best situated to review the government's record retention processes and ensure their continued effectiveness." 60 Fed. Cl. at 138.

- The proposed Preservation Order is substantially less burdensome than orders entered in other tribal trust cases. It does not require that Trustee-Delegates make inactive records available to plaintiffs for inspection prior to the service of a formal discovery request for those records. *See id.* at 141-42. Nor do plaintiffs seek through the entry of the Preservation Order to compel the government to index all documents, data and tangible things covered by the order. *See id.* at 141-42. The Preservation Order only requires that when Trustee-Delegates anticipate re-locating Plaintiff-Tribes' trust records, they provide at least 20 days advance notice of the movement as well as a copy of the move plan and certain other specified information (*see* ¶ 4). As addressed below, this is a comparatively minor burden given the special risk of loss or confusion of records that inevitably attends any attempt to relocate the documents.

- The only provision not included in preservation orders previously entered in other trust cases is the requirement that for each employee or agent of Defendants, their departments, agencies, offices, divisions *and contractors*, who have custody of plaintiffs' tribal trust records, that person must be advised of the terms of the Preservation Order, be provided with a copy of the Order and required to sign an acknowledgment (*see* ¶ 2(b)).

Such a requirement is significantly less burdensome than the inspection and indexing requirements imposed under the orders entered in other tribal cases.

Nevertheless, Trustee-Delegates assert several concerns with respect to the claimed impact of the proposed Order (Resp. at 36-43). These contentions are addressed in sections (a)-(c) below.

### a.    The Scope of the Preservation Order.

Like the preservation order entered in *Cobell* nine years ago, the Preservation Order proposed for entry here would require that Trustee-Delegates take reasonable steps to protect any documents which "embody, refer or relate to the accounts or assets held in trust by Defendants and their agents." (*See* ¶ 1(a)). The government takes issue with the scope of the Order, however, contending that it goes "far beyond any reading of the permissible scope of discovery" under the Rules (Resp. at 43).

This is incorrect. In this litigation, Plaintiff-Tribes seek a complete and accurate historical accounting of the trust funds and other assets held in trust for them by Trustee-Delegates. To fulfill such an obligation, it will be Trustee-Delegates' responsibility to provide an accounting that is "sufficient to serve the purposes for which a trust accounting is typically conducted," and that contains "sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carved out." *Cobell VI*, 240 F.3d at 1103. It is thus conceivable that virtually all of the tribal trust records in Trustee-Delegates' possession -- and then some – may be needed to come anywhere close to providing the "adequate" accounting the law requires. At this stage of the litigation, when Trustee-Delegates have not even taken the "first step" of developing a plan for fulfilling their accounting obligations, clearly they would be

acting at their peril (and threatening Plaintiff-Tribes with irreparable injury) by failing to maintain and protect *all* records relating to plaintiffs' trust funds and assets.[15]

In complaining about the scope of the proposed Order, Trustee-Delegates ignore the difficulty that would be presented for individuals endeavoring to comply with the Order if it were worded so as to require the preservation of only those trust records that are "relevant . . . to the subject matter of the pending litigation." So worded, compliance would be a challenge for even an attorney familiar with the tribal trust accounting litigation and with access to the Complaints and Answers filed by the parties. Indeed, as the Treasury Department recognized four years ago when presenting its plan for compliance with the CFC preservation order in *Pueblo of Laguna*: "There are literally thousands of good people, from clerks to managers, who need more certain guidance in order to apply this order to their daily business operations." Def. Exh. 54 at Tab A ("Status Report on the U.S. Department of the Treasury's Compliance Monitoring Mechanism, etc." at 1).

Like the preservation order this Court entered in *Cobell*, the proposed Order takes the "guesswork" out of the process for determining which trust-related materials should be protected. Consistent with this approach, "close calls" regarding whether or not to retain trust records are to be resolved in favor of preservation (¶ 1(b)); and, in the event of any uncertainty, Trustee-Delegates are to confer with Plaintiff-Tribes (*see id.*). The inclusion of such provisions clearly will reduce the risk of non-compliance with the Court's Order. More importantly, they

---

[15] Certain of Trustee-Delegates' communications regarding the retention of tribal trust records appear to recognize this. *See* Def. Exh. 6 – 2007 Jensen Memo at 2 advising that the "Litigation Hold" placed on tribal trust records covers "*anything reflecting or relating to . . . [a]ny asset,* such as funds, land, minerals, forestry, sand and gravel, or other resources, *that is, or at any time has been, held in trust by the United States or its agents . . . .*" (emphasis added).

should help to prevent vital trust records from being irretrievably lost due to mistakes in judgment regarding which materials are to be retained.

### b.    The Order's "Acknowledgment" Requirement.

This is an important provision of the proposed Preservation Order. Ensuring that every custodian knows and understands his or her obligations to preserve Plaintiff-Tribes' trust records is critical. And yet, literally dozens of the declarations of Interior employees filed with the Court on June 20 complain that requiring those in possession of trust records to execute such acknowledgments "would effectively result in the employees reporting to plaintiff's counsel rather than to their supervisors." *See, e.g.,* Def. Exh. 13 – Bourland Decl. at ¶ 5(a).

Such a concern is unwarranted – it reflects a fundamental misunderstanding of the proposed Order and what it requires. In fact, the executed acknowledgments are to be maintained by Defendants' counsel of record – *not* plaintiffs' attorneys. (*See* ¶ 2(b)). Attorneys representing the Tribal-Plaintiffs will not have access to the signed acknowledgment so long as Trustee-Delegates comply with the Order's terms. Only in the event of the destruction or loss of tribal trust records necessitating notification of the Court will any such acknowledgments be disclosed, and then only with respect to "those involved with the violation." (*See* ¶ 2(c). Accordingly, the concern raised in the declarations submitted by Defendants is completely unfounded.

### c.    The Order's "Notice-of-Movement" Requirement.

Trustee-Delegates also object to the requirement that Plaintiff-Tribes' be notified in advance of the transfer of their trust records from one location to another (Resp. at 37). Trustee-Delegates do so despite the fact that such a provision is substantially less burdensome than requiring the government to index all documents, data and tangible things covered by the Order –

US2000 10931078.1

a provision imposed in other preservation orders entered in tribal trust litigation.  Instead, the proposed Order would only require that when Trustee-Delegates anticipate re-locating Plaintiff-Tribes' trust records, they provide at least 20 days' advance notice and a copy of the "move plan," "box inventories" and "descriptions of the records being moved" (among other transfer-related information) (*see* ¶ 4).

This is a relatively minor burden given the special risk of loss or confusion of records that attend the re-location of such documents.[16]  Nevertheless, Trustee-Delegates go to great lengths to try to create the impression the Order's "notice of movement" provision is so overbroad it would be triggered by virtually any movement of trust records in conjunction with Defendant's use or handling of those materials.  That is simply *not* the case – as the "move plan," "box inventories" and related references in ¶ 4 should make abundantly clear.  Rather, this provision of the proposed Order will apply *only* when the location for maintaining or storing Plaintiff-Tribes' trust records is about to change.  The "notice-of-movement" requirement is clearly warranted under such circumstances.

**D.    Trustee-Delegates' Attempt to Subject Plaintiffs to a Preservation Order is Baseless and it Should Be Rejected Out-of-Hand.**

After spending more than 40 pages of their June Response arguing against the entry of the Preservation Order proposed by Plaintiff-Tribes, Trustee-Delegates do an abrupt about-face and assert that if such an Order is entered, it should be binding on "all parties to the litigation" (Resp. at 44).  However, *nothing* in the record supports Trustee-Delegates' demand to make the

---

[16] Indeed, it has been the experience of plaintiffs in other tribal trust litigation that – due to "deficiencies" in the "BISS" database developed by the government for identifying trust records stored at the AIRR facility – it is "virtually impossible . . . to locate specific documents at the AIRR "relevant to Tribal breach of trust claims."  *See* Declaration of Jim Parris in *Navajo Nation v. United States*, No. 06-945L, dated August 3, 2007 (copy attached as Reply Exh. 3) at ¶ 11. Sacrificing access to Plaintiff-Tribes' own records should not be the price to be paid for protecting such materials.

Order reciprocal to Plaintiff-Tribes.  To the contrary, Defendants' June 20 submissions show the complete absence of any need for the Court to consider doing so.  *See, e.g.,* Def. Exh. 17, Tab A at 3 (noting that "*it has been the practice of the [Salt River] Community not to destroy any records*") (emphasis added).

As the evidence of record before the Court so clearly reflects, there is a compelling need to compel Defendants' preservation of trust records in this litigation – just as there was in *Cobell* nine years ago, and more recently in *Pueblo of Laguna* and a half dozen other CFC tribal trust cases.  It is the government that has the "abysmal record" as trustee of failing to protect and maintain such records.  The same cannot be said about the Plaintiff-Tribes.  Each party must satisfy its own burden of proof, and Trustee-Delegates have made no attempt to do so here.

The government cites *United States v. Magnesium Corp. of Am.*, 2006 WL 2350155 (D. Utah 2006), an unpublished position by a magistrate judge, as support for its "reciprocity" argument.  In that case, the United States asked that a preservation order be entered against the defendant.  The defendant did not object to the request but asked that it be reciprocated.  The judge simply agreed it would be "equitable" for the order to be reciprocal, without engaging in the analysis set forth in *Pueblo of Laguna* or other similar cases.

Here, it would be manifestly "*inequitable*" to impose a Preservation Order on Plaintiff-Tribes.  It is Trustee-Delegates – *not* these trust beneficiaries – who are obliged as fiduciaries to retain and preserve Indian trust records and that have been guilty of "decades of neglect" in the performance of this trust duty.  Absent any basis in fact for making the proposed Order "binding" as to Plaintiff-Tribes, Trustee-Delegates' unwarranted demand for reciprocity should be rejected out-of-hand.

US2000 10931078.1

## III.    CONCLUSION

For all of the foregoing reasons, Plaintiff-Tribes respectfully request that the Court grant their request for relief and enter the proposed Preservation Order accompanying their April 29 motion.  Plaintiff-Tribes further request that a similar form of Order be issued in all of the other tribal accounting cases pending in this Court in which plaintiffs have joined in requesting such relief.

This 16th day of July, 2008.

Respectfully submitted,

/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com
CATHERINE F. MUNSON
Georgia Bar No. 529621, Admitted *Pro Hac Vice*
Email: cmunson@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800
*Attorneys for Plaintiffs*
*Ak-Chin Indian Community*
*Salt River Pima-Maricopa Indian Community*
*Tohono O'odham Nation*
*Passamaquoddy Tribe of Maine*

25

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR ENTRY OF TRUST RECORD PRESERVATION ORDER was electronically filed using the Court's ECF system and that the below-listed counsel are ECF users and will be served via the ECF System:

John H. Martin, Esq.
United States Department of Justice
Environmental and Natural Resources Division
Natural Resources Section
1961 Stout Street, Eighth Floor
Denver, CO  80294

Kevin E. Regan, Esq.
United States Department of Justice
Environmental and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663

This 16th day of July, 2008.

/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com
CATHERINE F. MUNSON
Georgia Bar No. 529621, Admitted *Pro Hac Vice*
Email: cmunson@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800
*Attorneys for Plaintiffs*
*Ak-Chin Indian Community*
*Salt River Pima-Maricopa Indian Community*
*Tohono O'odham Nation*
*Passamaquoddy Tribe of Maine*

# In the United States Court of Federal Claims

No. 06-935 L
(Filed: July 9, 2008)

```
**************************************
SEMINOLE NATION OF OKLAHOMA,        *
                                    *
             Plaintiff,             *
                                    *
v.                                  *
                                    *
THE UNITED STATES,                  *
                                    *
             Defendant.             *
**************************************
```

## ORDER

Before the court is plaintiff's Motion for Document Preservation Order, Confidentiality Agreement and Protective Order. In its reply brief, plaintiff represents that the parties reached an agreement for a Joint Stipulated Confidentiality Agreement and Protective Order, which was ultimately filed with the court on June 12, 2008. Given the parties' agreement with respect to a confidentiality agreement and protective order, thus mooting the issue, the court addresses only the remainder of plaintiff's motion: its request for a document preservation order ("DPO").

Plaintiff requests that the court enter a DPO that it represents is "substantially similar to those entered in the The Kaw Nation of Oklahoma v. United States, No. 06-934." Pl.'s Mot. 1. Defendant, however, emphasizes, among other things, that the Kaw Nation of Oklahoma DPO created difficulties in that proceeding and ultimately was modified by the court. See Def.'s Resp. 5-6 (arguing that the "history of this issue in Kaw Nation is important here because Plaintiff has proposed an order strikingly similar to the Kaw Nation hybrid preservation/discovery order"). Specifically, defendant maintains that the proposed DPO goes beyond the scope of addressing preservation issues and is overly burdensome because it "sets forth a schedule requiring that the Government simultaneously make available potentially relevant documents . . . in a large number of records sites involving many different agencies." Id. at 3; accord id. at 2 ("[T]he order proposed by Plaintiff does not even truly address preservation issues. Instead the proposed order would dictate the actual production of materials, providing Plaintiff immediate authority to proceed with burdensome discovery that exceeds the scope permitted by the Rules of the Court of Federal Claims ("RCFC").""). Defendant also argues that plaintiff has failed to demonstrate the need for a DPO in this case. Id. at 1.

Defendant appended extensive exhibits to its response. These exhibits document the government's implementation of protocols designed to preserve relevant documents. They also

contain numerous declarations from agency officials explaining in detail the undue burdens these agencies would encounter should the court enter plaintiff's proposed DPO. Plaintiff responds to these exhibits by stating that the agencies' protocols defendant references were designed to address the concerns expressed by Judge Royce C. Lamberth in Cobell v. Norton, No. 96-1285 (D.D.C. filed June 10, 1996), and that the government's actions "do[] not eliminate the need for a document preservation order." Pl.'s Reply 2. Noting that this court previously has taken judicial notice of Judge Lamberth's findings in Cobell, see id. at 3 (citing Pueblo of Laguna v. United States, 60 Fed. Cl. 133, 138-39 & n.9 (Fed. Cl. 2004)), plaintiff argues that the "additional precaution of document preservation . . . is not an unreasonable or unequitable request when weighed against the irreparable harm which would result if any documents are mistakenly destroyed or lost," id. at 2.

The court agrees with plaintiff that a DPO serves as an additional precaution, particularly in light of the prior loss or destruction of documents in related cases:

> [T]he failures evidenced in Cobell appear to be so pervasive and systemic as to provide ample support for the issuance of a document preservation order in this case. If nothing else[,] such a preservation order will reemphasize that defendant needs to take extraordinary precautions . . . to prevent either the purposeful or inadvertent destruction or loss of records.

Pueblo of Laguna, 60 Fed. Cl. at 139. Therefore, the court disagrees with defendant's assessment that no preservation order is necessary given the voluminous efforts discussed in defendant's response and detailed in its exhibits. Nevertheless, upon review of plaintiff's proposed DPO, the court agrees with defendant's assessment that the proposed DPO is far too broad, unduly burdensome, and reaches into the realm of a discovery order.

Plaintiff's proposed DPO sets forth a general provision detailing the parties' general obligation to preserve documents and other materials; however, it also contains provisions concerning document inspection, document production, and the imposition of deadlines by which the parties shall furnish, inter alia, indices and inventories, and designations of boxes or records sought for review. It establishes protocols for the movement of boxes, document production, and the availability of records for inspection and designation. These provisions, rather than imposing an affirmative obligation upon the parties to preserve documents, set forth discovery procedures and processes. See Def.'s Resp. 21 ("[T]he proposed order provides very little instruction about preserving documents. . . . Instead, a cursory examination reveals that the vast majory of the proposed order's provisions govern discovery processes."). It is unclear from plaintiff's reply whether plaintiff acknowledges or disputes defendant's contention that its proposed DPO is designed to impact the discovery process merely beyond the preservation of documents. Compare Pl.'s Reply 4 ("Despite Defendant categorization of the Plaintiff's proposed order as a 'discovery order,' Plaintiff does intend for the document preservation order to replace traditional discovery procedures as required under the Rules of the Court of Federal Claims . . . or the Federal Rules of Civil Procedure . . . ."), with id. ("Plaintiff's mechanisms included in the

document preservation order are only intended to ensure no previous destruction of documents has occurred."). Regardless, the court will not permit plaintiff to misuse a DPO as a discovery tool.

Defendant notes that "no effort has been undertaken to follow" established rules and procedures for discovery in this case at this time. Def.'s Resp. 21. Specifically, defendant indicates that the parties have not conducted their meeting of counsel or filed their joint preliminary status report, as required by Appendix A of the RCFC. The court notes that defendant's answer was first filed on June 10, 2008, and that the parties' JPSR is due by August 4, 2008. Therefore, the parties have ample time to conduct their meeting of counsel and address discovery issues during their preparation of the JPSR. Given the parties' ability to negotiate the terms of a confidentiality agreement and protective order, the court believes that the parties can successfully negotiate the terms of a DPO such that both parties' concerns are adequately addressed. Pursuant to section III, paragraph 5 of Appendix A of the RCFC, the parties shall set forth a proposed discovery plan in their JPSR. The court directs the parties to append a proposed DPO to their JPSR or, in the absence of an agreement upon the terms of a DPO, indicate the areas of disagreement in the JPSR.

To summarize, the court is receptive to providing plaintiff with "an additional safeguard for the documents relevant in this litigation." Pl.'s Reply 5. However, the court will neither saddle defendant with unreasonable obligations nor permit plaintiff to use a DPO as a means to circumvent normal discovery procedures. Therefore, the court **GRANTS IN PART** plaintiff's motion insofar as it requests entry of a DPO. Because it finds that plaintiff's proposed DPO encompasses elements that exceed the scope of a DPO, the court **DENIES IN PART** plaintiff's motion to enter its proposed DPO. Furthermore, for the reasons noted above, the court **DENIES IN PART AS MOOT** those portions of plaintiff's motion concerning the terms of a confidentiality agreement and protective order. **The parties shall file a proposed DPO with their JPSR, which is due by no later than August 4, 2008, and, in the absence of an agreement with respect to discovery or the terms of a DPO, shall set forth their respective positions in the JPSR.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

-3-

**PL. REPLY EXH. 2**

# In The United States Court of Federal Claims

NAVAJO NATION                          )
f.k.a. NAVAJO TRIBE OF INDIANS,        )
                                       )
                Plaintiff,             )
                                       )
        v.                             )          No. 06-945L
                                       )          Judge Francis M. Allegra
UNITED STATES OF AMERICA,              )
                                       )
                Defendant.             )


### Defendant's Supplemental Notification of Additional Discovery of
### the Possible Presence of Mold or Water Damage to Documents

In Defendant's filings on April 15, 2008 (Docket ("Dk") 49) and May 8, 2008 (Dk 53),

Defendant advised the Court of the discovery of nine boxes potentially containing mold and/or

water damaged documents of Bureau of Indian Affairs ("BIA") records by the United States

Department of the Interior ("Interior"), Office of the Solicitor ("Solicitor's Office") attorneys.

The discovery was made while Solicitor's Office attorneys were performing a privilege review

of a collection of 709 boxes of BIA Navajo Regional Realty Office records transferred from

Window Rock, Arizona to the Gallup, New Mexico Federal Building.  Two additional boxes that

might contain exposed documents were later identified by Assaigai Laboratories of

Albuquerque, New Mexico, contractors hired to perform testing concerning the presence of mold

and/or water damage.

In a status conference with the Court on June 6, 2008, Defendant informed the Court of

its plan to amend the November 30, 2007 Record Retention Order ("RRO") to permit movement

of the affected boxes to Albuquerque, New Mexico for the purposes of testing and remediating

the affected records. Based upon the analysis completed by Interior as of the June 6, 2008 status conference, Interior had determined that 574 boxes needed to be tested in Albuquerque for mold and/or water damage. At that point, Defendant had preliminarily concluded that 135 boxes of the 709 box collection could remain in Gallup for completion of the privilege review by the Solicitor's Office to be followed by the document review by Plaintiff.

Thereafter, on July 7, 2008, prior to the filing of the Defendant's motion to amend the RRO, the Solicitor's Office advised the Department of Justice that one of the Solicitor's Office attorneys had reviewed the 135 boxes on a file by file basis and determined that seven boxes out of the 135 required further testing and potential remediation. The seven boxes did not have obvious signs of water and/or mold damage. The criterion used to identify these seven boxes was simply that if any document within the box showed some evidence of exposure to water or mold, then the entire box was selected. The potential for damage only became apparent after a second, closer review at the file level conducted out of an abundance of caution  The net effect is that seven additional boxes will be moved to Albuquerque for testing and possible remediation, if needed, making the total number of boxes to be moved 581.  Thus, 128 boxes will remain at the Gallup Federal Building (i.e., the original 135- 7 = 128) for completion of the privilege review and continued document review by Plaintiff.

Defendant attaches as Exhibit 1 a report dated July 8, 2008 by Solicitor's Office attorney Gladys Cojocari explaining in greater detail the discovery of the seven additional boxes described above, which Defendant has determined should be the subject of further testing and, if necessary, remediation. Defendant will file additional progress reports with the Court as appropriate.

Defendant contacted Plaintiff's counsel Mr. Rey-Bear and advised him of the events

described herein on July 7, 2008.

Respectfully submitted this 8th day of July, 2008.

RONALD J. TENPAS
Acting Assistant Attorney General


s/Robert W. Rodrigues
ROBERT W. RODRIGUES
Trial Attorney
E. KENNETH STEGEBY
Trial Attorney
AYAKO SATO
Trial Attorney
Unites States Department of Justice
Environment and Natural Resources
Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: 202.353.8839
Facsimile: 202.305.0506
Email: Robert.Rodrigues@usdoj.gov



# United States Department of the Interior

OFFICE OF THE SOLICITOR
1849 C Street N.W.                                    Exhibit 1
Washington, DC 20240

Indian Trust Litigation Office
Room 6422                                                                July 8, 2008

## MEMORANDUM

**TO:**        Robert Rodrigues, Department of Justice

**FROM:**    Gladys Cojocari, Attorney Advisor, Office of the Solicitor

**RE:**         Addendum to Report on Discovery of Damaged Documents

### Background

This is an addendum to my report of May 8, 2008, concerning the discovery of 11 boxes containing documents damaged by mold or water out of a group of 709 boxes moved from the Window Rock Realty Office ("WRRO") to the Navajo Regional Office ("NRO") in Gallup, New Mexico. Nine of these boxes were identified in the course of a privilege review conducted by the Solicitor's Office, which reviewed 135 boxes out of the 709. During the week of June 30, 2008, in the exercise of caution, I conducted a file-by-file review of these 135 boxes to ensure that no damaged documents had been missed. I did so given that the initial review had been conducted for privilege, not damage, and damage is not always immediately evident. Specifically, damage can be concentrated on the edges or spines of files which may not be readily apparent to the eye This secondary, focused review uncovered an additional seven boxes from the **same accession** out of the WRRO containing at least one document showing signs of mold/mildew or water damage. None of the records in the 7 boxes were rendered illegible. In general, the damage observed to documents in this group of 7 boxes is less obvious than the damage reported to documents in the first group.

These additional potentially, damaged documents were moved from the same place, Window Rock, Arizona, to the same Gallup Federal Building and stored under the same conditions as those identified in my May 8 report. There have been no intervening events to cause additional damage since that time. Therefore, defendant's answers to the Court's questions concerning the best estimate of when the damage occurred and the circumstances concerning the discovery of the damage remain the same as in my May 8, 2008 report.

### Inventory of Additional Boxes containing damage to documents.

Following is a description by accession number of the contents of the seven additional boxes and the damage that I observed to them:

- N00-07-8124 Box 94 of 258

The box contains 12 folders. One is labeled the Navajo Tribe Uranium and Vanadium leases FY 1962;   the remaining 11 are collection files from 1965 to 1980. One folder shows signs of water damage and mildew along the edges of a few documents.

- N00-07-8124 Box 182 of 258

This box contains 16 folders of oil and gas and uranium leases from 1963-1984, royalty statements and exploration plans. One folder and the documents therein show water stains along the edges.

- N00-07-8124 Box 188 of 258

Uranium Leases 1967-1985. Three folders show signs of water damage, and there is also damage to a set of blueprints. Other documents are not affected.

- N00-07-8124 Box  199 of 258

This box contains 15 files of Oil and Gas Production on Tribal Lands, December 1964 to February, 1966.  All folders show some signs of water damage and a few have mildew on the inner edges.

- N00-07-8124 Box 210 of 258

This box contains 19 Oil and Gas files from FY1981-1988. Two files show signs of mildew on the spines of the files and on the edges of a few documents.

- N00-07-8124 Box 220 of 258

This box contains cancelled uranium leases organized by company. Three folders show signs of discoloration on the spine, and the backs of approximately 10 pages of documents are affected. The affected folders are: Vanadium Company Production Reports from 1956 and 1961, and correspondence from 1953.

- N00-07-8124 Box 232 of 258

This box contains ten Indian Land Lease case files, ranging from 1960 to 2008. Three folders show slight water damage, and the margins of some documents in one are mildewed.

    Only the additional boxes containing documents showing mold or water damage in need of possible remediation have been identified above. These will be sent to OTR's remediation contractor in Albuquerque along with the eleven previously identified boxes when the Court approves the planned document move.  With the addition of these 7 boxes, a total of 581 boxes (rather than 574) will be sent to the GSA Warehouse in Albuquerque for assessment and, if necessary, remediation.

    Finally I would note that this accession also contains many documents from the 1940s, 1950s and 1960s. Many of these are brittle and discolored simply because of age. I have

2

requested plaintiff's reviewers to use extra care with these.

UNITED STATES COURT OF FEDERAL CLAIMS

NAVAJO NATION )
f.k.a. NAVAJO TRIBE OF INDIANS, )
)
Plaintiff, )
)
v. )                                   No.  06-945 L
)                                   Judge Francis M. Allegra
UNITED STATES OF AMERICA, )
)
Defendant. )

## DECLARATION OF JIMMY RAY "JIM" PARRIS

I, Jimmy Ray "Jim" Parris, hereby declare that I am more than eighteen years of age, the matters stated herein are based upon my personal knowledge, I have executed this Declaration within the United States and it has been made pursuant to 28 U.S.C. § 1746:

1.      My name is Jimmy Ray Parris, though I am commonly known as Jim Parris.  I am a member of both the Cherokee Nation and the Osage Nation of Oklahoma.  I am also a Certified Public Accountant.

2.      I served as the first Controller for the Osage Nation in 1978-1979.  I also served as Acting Finance Director for the Pascua Yaqui Tribe of Arizona in 1998-1999, and then served as CFO and Treasurer for the Cherokee Nation during 1999-2000.

3.      I also have extensive experience with the Bureau of Indian Affairs (BIA). Specifically, I served as the first Chief of the Branch of Trust Fund Accounting for the BIA from January 1985 until July 1991, when I became, as a member of the Senior Executive Service, the first Director of the Office of Trust Funds Management for the BIA.  I also served as the Indian Service Special Disbursing Agent (ISSDA) for the Individual Indian Monies (IIM) accounts from 1986 until I left federal governmental employment in May 1995.

1

4.      I have worked on a wide variety of financial matters of Indian Tribes since leaving BIA employment.  Over the immediate past 12 years, I have worked as a consultant with various Indian Tribes around the United States, while working for KPMG, a national accounting firm, REDW, a regional accounting firm based in Albuquerque, and as a sole practitioner.  I also have served as Treasurer of the Board of Directors for the InterTribal Monitoring Association on Indian Trust Funds, as Treasurer of the Board of the Native American Finance Officer's Association, and on the Board of Directors for the Council of Energy Resource Tribes.  I currently serve as Treasurer on the Board of Directors for the Indian Land Working Group.

5.      While working as a consultant to Indian Tribes, I have been retained as an expert consultant in the areas of BIA-Tribal trust fund management, investments, and all related activities by the Pueblo of Laguna, the Blackfeet Tribe, the Shoshone-Bannock Tribes, the Osage Nation, the Jicarilla Apache Nation, the Navajo Nation, and the Confederated Tribes of the Warm Springs Reservation, as well as several other Tribes, assisting them primarily with the acquisition and analysis of financial and trust related documents needed to determine whether they have bases for claims in their breach of trust lawsuits against the United States as trustee of their funds in lawsuits principally in the United States Court of Federal Claims.  I also have assisted the Confederated Tribes of the Warm Springs Reservation and the Jicarilla Apache Nation in alternative dispute resolution processes between the Tribes and the United States arising out of their lawsuits.

6.      I have personally made nine visits to the National Archives Records Administration records facility in Lenexa, Kansas, known as the American Indian Records Repository (AIRR), to perform record review in support of breach of trust cases against the United States for certain Indian Tribes, as listed below:

| Dates of AIRR Visits: | Review of Records on Behalf of: |
|---|---|
| December 28-29, 2004 | Confederated Tribes of the Warm Springs Reservation |
| January 5-7, 2005 | Confederated Tribes of the Warm Springs Reservation |
| April 19-20, 2005 | Osage Nation |
| May 3-4, 2005 | Osage Nation |
| August 3-5, 2005 | Osage Nation |
| August 8-12, 2005 | Osage Nation |
| August 12, 2005 | Shoshone-Bannock Tribes of Fort Hall, Idaho |
| September 12-16, 2005 | Shoshone-Bannock Tribes of Fort Hall, Idaho |
| October 26-27, 2005 | Shoshone-Bannock Tribes of Fort Hall, Idaho |

7.    In connection with the above engagements, I have spent over 200 hours reviewing documents that Defendant has produced at various locations, including the AIRR. As a result, I have become familiar with the Box Index Search System (BISS), a database that the United States maintains to identify records that are stored at the AIRR facility and other locations. In each of my record review visits at the AIRR, which were all dependent on searches using the BISS database, repeated attempts to efficiently and accurately access certain records or even classes of records resulted in difficulty in locating the documents for which I was searching due to the serious deficiencies in the BISS.

8.    Based on my personal experience in doing research at the AIRR, I have found that the BISS indexes Indian trust records at the file level, not at the document level. This is confirmed by a September 2005 Department of the Interior report entitled *Historical Accounting For Individual Indian Monies-A Progress Report* (available at www.doi.gov/indiantrust/iimaccounting.pdf), where it is stated in the text and a side bar on page 10 that, "boxes of records in the AIRR are electronically indexed to the file level, with the resulting data entered into the Box Index Search System."

9.    The BISS is the database search tool made available to Indian Tribes, individual Indians, and other researchers that have obtained the approval of the Department of the Interior to

3

search records that have been entered into the database maintained at the AIRR. The BISS is the only index that the United States makes available to search the records and documents located at the AIRR. The BISS is supplemented by a software system called "ArchivalWare", which is the software used to access the BISS database. Selected data is entered into the BISS database by a contractor (at present that contractor is Labat Andersen) with the Office of Trust Records (OTR) on-site at the AIRR from files within each box that has been moved to the AIRR.

10.    Based on testing and document research that I have performed with the BISS for various Indian Tribes, the BISS suffers from a number of defects that make it of limited value in searching Tribal trust records at the AIRR relevant to Tribal breach of trust claims. The BISS typically lists only the titles of the files in a particular box without further information. In addition, in some cases, file titles in the BISS are not detailed enough to locate specific relevant records or forms and, in other instances, some files have been omitted entirely from the listing. Furthermore, inconsistent file labels have been used in the BISS for the same kinds of documents. For example, mail logs—a standard form of document critical for tracking income, disbursements, and investment purchases and maturity notices to the Tribes and Banks—are also variously referred to in the BISS as "daily logs," "check logs," or "schedule of collections". This problem is further compounded by the fact that the BISS also uses the identical term "schedule of collections" for a completely unrelated form, the Schedule of Collections (SF-1041).

11.    Based on testing and document research that I have performed with the BISS for various Indian tribes, the BISS suffers from a number of other deficiencies that make it virtually impossible, as a matter of routine, to locate specific documents at the AIRR relevant to Tribal breach of trust claims. In particular, the BISS database is **not** reliable for finding: (a) specific government

4

forms by form name or form number; (b) documents identified for specific Tribes; (c) documents identified to specific locations (i.e.-Agencies, Area Offices, etc.); (d) documents by date; (e) documents containing Tribal versus individual Indian Money (IIM) transactions; (f) specific transactions by transaction number; (g) specific reports; or (h) specific transaction types.

12.     The following are examples of some of the problems that I have identified with the BISS based on my use of it:

a.      Bills of Collections, Form Number DI-1040, could not be found for a specific Tribe because data is not indexed to distinguish between tribal, IIM, or BIA documents;

b.      Summary and Detail of Trust Funds Reports—which were sent out to all Tribes with trust accounts as the official BIA accounting record from 1972 through 1995—could not be found for a specific Tribe Code and Agency Location Code for most years in any decade;

c.      Manual Control Cards—critical historical official documents maintained by the BIA from approximately 1968 through 1987 on balances available for disbursement or investment in each Tribal account—could not be found for any years available;

d.      Treasury account Deposit Tickets, Form SF-215, could not be identified by Tribe, and also could not be distinguished by the BISS from a deposit to a local bank account for a bank loan payment;

e.      Production Reports, Form ADI530R1—issued and sent to the BIA by the Minerals Management Service—could not be found for a specific Agency Location Code and year, and in one instance the BISS identified a specific box even though, upon examination, the box did not contain the identified Report;

5

    f.      BIA CD Investment Reports by Tribe—a routine investment report—could not be found for specific periods;

    g.     Account statements for known Tribal IIM accounts for a specific Tribe and Agency Location Code could not be found;

    h.     Statement of Differences, Report Number BA6652—a routine Treasury report sent to accounting offices from the late 1960s through the present—could not be found, and the few boxes identified by the BISS to contain those reports did not, in fact, contain them;

    i.      Searches for documents related to income from uranium for any year only identified reports that mentioned "Uranium" in the title;

    j.      Forest Management Plans—standard documents governing the management of tribal forests by the BIA—could not be found for various relevant agencies;

    k.     Audit reports, known to exist, for a specific tribe could not be found; and,

    l.      A search for documents related to a specific tribe identified documents that upon inspection only referred to a member of the tribe.

13.    The defects in the BISS are further illustrated by a joint discovery project conducted during July and August 2005 to locate missing records relevant to a particular Tribal trust case filed in the United States Court of Federal Claims:

    a.     For purposes of that joint effort, the plaintiff prepared a list of specific documents that were relevant to its claims. I then met for about two hours with Ms. Caren Dunne, who was identified by the United States as very knowledgeable about the BISS and who was and is a principal of Chavarria, Dunne, and Lamey, LLC (CDL). CDL is an accounting firm under contract with the United States concerning pending Tribal breach of

trust cases and consists in part of accountants, including Ms. Dunne, who had previously worked on the so-called Tribal reconciliation project for BIA in the 1990s while they were employed with Arthur Andersen. During our meeting, Ms. Dunne conducted a number of searches of the BISS in an effort to locate the boxes at AIRR that might contain the specific documents that the plaintiff had identified as relevant to its claims. Ms. Dunne's search resulted in a list of approximately 300 boxes that possibly contained those documents. As a result of my own searches of the BISS, I separately identified approximately 50 additional boxes that might contain those documents.

      b.     Out of the approximately 350 boxes identified as a result of these searches in the BISS, we subsequently located only a handful of relevant documents. During August 2005, a joint team of approximately six staff accountants employed by CDL, one local staff person from the AIRR, two paralegals from a Tribal law firm, and I worked at the AIRR to review all of the boxes that had been identified by either Ms. Dunne or by me as possibly containing the documents relevant to the plaintiff's claims. That joint review lasted about two weeks and involved over 300 staff hours for the one Tribal team alone that I worked with, in addition to the CDL staff time for the reviews. However, those joint search efforts resulted in locating only a small fraction of the records that had been identified in the BISS.

      14.     Apart from the above numerous and systemic problems with the BISS, my own experience at the AIRR indicates that document review there is also limited in other ways. For example, the AIRR imposes seemingly unnecessary and constraining prohibitions on the types of devices that are allowed to be taken inside the facility, such as voice recorders to document record review, cameras to document the condition of the facility, the boxes in which documents are stored,

and the condition of documents themselves. We also were required to have a representative of the Office of the Solicitor present while we were reviewing documents at the AIRR. This was required in addition to going through x-ray scanners and having security guards searching our bags both going in and leaving the AIRR.

15.    On June 28, 2007, the Government submitted a declaration to this Court by Ms. Ethel Abeita, Director, Office of Trust Records (OTR), dated June 20, 2007. In that declaration, Ms. Abeita made certain statements concerning the BISS and the AIRR. She has stated in paragraph 12 of her declaration that, "Fiduciary trust program records are indexed at the document level, meaning that every document in a file folder, or where there are no folders, every document in a box is indexed." This is not the case, based on my own experience with the BISS and the AIRR based on the United States' own report (i.e.- the *Historical Accounting for Individual Indian Monies – A Progress Report*) about the AIRR.

16.    I declare under penalty of perjury that the foregoing is true and correct.

Executed on <u>August 3, 2007</u>

Jimmy Ray "Jim" Parris